[No. 24837. Department Two. January 31, 1935.]

LORRAINE DuFRAINE, *Respondent*, v. THE DEPARTMENT OF LABOR AND INDUSTRIES, *Appellant*.[1]

*The Attorney General* and *Browder Brown, Assistant,* for appellant.

*E. D. Germain,* for respondent.

GERAGHTY, J.—This is an appeal by the department of labor and industries from a judgment of the superior court of Cowlitz county reversing an order of the

[1]Reported in 40 P. (2d) 987.

joint board of the department rejecting the claim of respondent for compensation under the workmen's compensation act. The joint board rejected the claim for the reason that the condition for which respondent claimed compensation was not the result of an accident occurring in the course of her employment. For convenience, we will hereafter refer to the appellant as the department and to the respondent as claimant.

Claimant testified before the joint board, in substance, as follows: In the early part of September, 1931, she was employed by the Longview Fiber Company. Her work was to fold cardboard boxes and put them on a carrier. As she folded the boxes, she would stack them in a pile on a table at which she worked, and then lift the pile onto the carrier. In stacking the boxes on the carrier, she would sometimes have to reach quite high, dependent upon the height of the stack.

On the day of her alleged injury, a pile of boxes she was putting on the carrier slipped back, and she was struck on the right side of the abdomen, just over the gall bladder. The accident happened about eleven o'clock in the forenoon. She told Mr. Page, the superintendent of the plant, that her side hurt and she would like to get a medical order to the doctor. He asked her if her hurt was so bad that she had to go home; if not, he would like to have her work the rest of the day as he was short of help. She remained at her work the rest of the day.

The Longview Fiber Company had a contract with the Longview Memorial Hospital for medical services for its employees, and maintained a nurse at the plant. When this nurse was off during the noon hour, the telephone operator issued any medical orders required. A medical order was given to claimant during the noon hour by the telephone operator. The order had en-

dorsed on it a reference to Dr. Coffin, who treated the company employees at the hospital, and she called on him either that evening or on the next day, the ninth, as his records show. Dr. Coffin diagnosed her condition as gall bladder trouble resulting from strain, and prescribed treatment and gave her some medicine for immediate relief.

She continued treatment with Dr. Coffin for one or two months, without any improvement in her condition. A large lump developed on her side, accompanied by considerable pain, and she did not work after the date of the hurt. She was not certain of the date, but the company's records show that the last day she worked was the eighth of September. She made no claim to the department for compensation, explaining that she did not do so because Dr. Coffin said her condition was not compensable under the act.

She was operated on by Dr. C. J. Sells, of Longview, on July 5, 1932. By that time the lump on her side had attained the size of a man's fist. Dr. Sells diagnosed her trouble as a hematoma, or blood clot developing into a large abscess around the rectus muscle. He performed a successful operation, and she had completely recovered her health at the time the claim was heard by the joint board.

Iris Haley, testifying on behalf of claimant, said that she was working with claimant at the plant on the day of the alleged injury. Claimant told her that she had hurt her side, and showed her the hurt in the ladies' rest room. The witness described the hurt as a discolored mark about the size of a dollar, but she did not notice whether there was any swelling. She saw the hurt afterwards, in December, and said it had swollen quite a bit.

Ethel Moore, testifying for claimant, said she had worked for the fiber company the year before, but at

the time of the accident was not employed there; that claimant told her she had been hurt the day of the accident. She did not see the hurt when claimant first told her of it, but felt it through claimant's sweater. Later in the evening, she saw the hurt and found it swollen and inflamed. She visited back and forth with claimant and saw the hurt frequently thereafter; claimant, she said, did no work except light housework and taking care of herself. She accompanied claimant to the hospital at the time of the operation.

It was stipulated that a Mrs. Hogarty, if called as a witness by claimant, would testify that, on the evening of the injury, claimant had been taken by Mrs. Hogarty in her car to the office of Dr. Coffin in Longview; that she was present at the time he made a brief examination of claimant; that she heard him inform claimant that she was suffering from gall bladder trouble as the result of strain; that she saw claimant on numerous occasions afterwards and saw the injured area to the right of the abdomen just under the ribs.

Dr. C. J. Sells, a surgeon called by claimant, testified that she consulted him about the lump on her side. His examination at that time showed a tumorous mass in the right rectus muscle just over the gall bladder area. The mass was a little larger than a man's fist, and seemed firmly attached. He diagnosed it as some form of tumorous mass in or on the muscle or in the sheath of the rectus muscle, and that he believed it was a hematoma or large blood clot and advised an operation. He performed an operation on July 5, 1932, at the Longview General Hospital, Dr. Christianson assisting. Describing the operation, he said:

"We cut down to the sheath of the rectus muscle. We then opened the sheath of the rectus and about six to eight ounces of thick pus escaped, which was

sealed within this sheath. The rectus muscle was quite thin or atrophied where the pus was laid. Just below the muscle was perhaps about two ounces more of pus and several dark, almost black, masses of blood clots. . . . Q. In your opinion, as a medical man, finding the abscess— Pardon me, did you state you found some blood clots there? A. Yes, there was some old black blood, as the remainder of what had been a large blood clot. There was only probably two ounces of black blood at the time of the operation. Q. Doctor, in your opinion, as a physician and surgeon, what would be the cause of the presence of that old blood from blood clots? A. It is my opinion it is either due to a ripping of the muscle or strain, or a possible blow over the abdomen at that point that was the cause of the blood clot forming. Q. Would, in your opinion, there be any other normal cause for that except one of those two? A. I don't believe so. Q. Doctor, from your examination and your experience as a physician and surgeon, was the reasonable conclusion that the abscess that formed there was the result of some strain or traumatic condition? A. No. The hematoma, the blood clot, was the result of some kind of an injury to the body and the abscess was the result of the old hematoma finally breaking down. Q. In other words, the final abscess was related, as a matter of fact, to the original injury then through the presence of a blood clot. Is that your view? A. I suppose that would be the way to put it."

On cross-examination:

"Q. What extent of trauma or how severe must the trauma be before it will cause a hematoma? A. I believe one could say that sometimes a trivial one will and one almost severe enough to kill you won't. You cannot say how severe a trauma it would take. I have seen several minor injuries produce hematoma. . . . Q. Doctor, assuming such an injury on September 1, 1931. Could that cause the hematoma which you removed on July 5, 1932? What is the relationship between the cause and effect? A. Ordinarily a hematoma developing at that time would have become absorbed long before the date of the operation, but

they sometimes become organized and later break down as abscesses and may be there months and months, but usually a hematoma is absorbed by the system, but sometimes they don't become absorbed, and break down later as abscesses. . . . Q. Could you tell the age of that blood clot from its appearance? A. Not from the blood clot; you could say quite definitely it was of a number of months duration from the appearance of the tissue surrounding the abscess; it must have been of some duration, because there was a lot of old necrotic tissue. The rectus muscle proper was probably one-half its thickness at the point of the abscess, as it was some distance above and below the abscess. . . . It must have been a cold abscess, and a cold abscess is generally of long duration, because she was not running a temperature. . . . There was evidence of thinning of the rectus muscle due to the long continued abscess. . . . Q. Is there any way to determine age of blood found after incision? A. I believe not, no definite way. According to medical literature we may get a hematoma that will become organized and then calcify and may remain for years latently without breaking down and becoming abscessed. Those are exceptional cases, but they have been recorded. . . . Q. Would a blow such as she claimed she received cause the blood clot through all that fat? A. It is my opinion that the hematoma was not the result of a blow, as it was a strain, and it is possible for it to appear especially when struck against the angle of the rib; a person may strike or pinch between the angle of the rib, causing a hematoma, but I would rather believe that instead of that, that could be due to this motion (indicating upward motion) that would be more apt to produce a hematoma within that particular area."

Dr. G. H. Coffin, a physician in general practice at Longview, called by the department, testified that claimant called at his office September 9, 1931; that she complained of a pain in her right upper abdomen; he did not remember that any history was given as to

the cause of the pain. When asked what examination he gave her at the time, he answered:

"It evidently was an examination for some gall bladder condition, because she was referred to Dr. Hayes at the hospital, and went down there and had a gall bladder picture taken the next day."

He did not see the picture; he got a report from Dr. Hayes that the picture disclosed a gall bladder condition; by a gall bladder condition he meant either an inflammatory condition of the gall bladder or gallstones.

"Q. What were you treating Miss DuFraine for on those occasions? A. As near as I can remember, of course, I didn't have any history of the case, but we had this gall bladder picture. Evidently I treated her for a gall bladder condition."

On cross-examination:

"Q. Doctor, I note you speak again in answering a question, you say evidently you treated her for gall bladder. You don't find anything in your record to show just what your treatments were for? A. No, but I know that I did. I must have treated her for gall bladder. Q. Doctor, we are trying to get this as definite as we can. You say you must have treated her for gall bladder trouble? A. Yes, I must have. Q. In other words, you are not relying on your distinct memory, but you are relying upon such records as you have, or are able to find at this time from which to determine the nature of the treatment accorded her, is that correct? A. Sure."

Several of claimant's fellow-employees engaged in the same work testified that they saw claimant sustain no injury during the month of September, nor did she report any injury to them. The witness Carl DePriest, called by the department, testified that he was employed at the box factory, and that, in the summer of 1931, and before September 1st, she rode with him to and from work. Asked if claimant ever

complained to him of any lump or mass in her abdomen, he answered that, at one time on the job, it seemed she was off a day or so, and she came back and she had this knot on her side. He did not state definitely when this was, but as the weather was pretty warm, it must have been in July or June.

"Q. Where did this occur, at the plant? A. Yes, right at the tape machine. Q. What did you feel when you applied your hand in the region of her abdomen? A. Just a knot, swelled up place."

Asked if she told him the cause of the lump, he answered he did not know. He was unable to fix the time that this occurred, except that it was in the summertime. He did not remember whether she worked after the occurrence or not. She told him the lump was bothering and hurting, but did not know what caused it, and she did not tell him how long it had been present.

C. J. Page, superintendent of the plant, quite positively denied that claimant had reported to him as she testified. There is in the files of the department, however, a report of an investigation by one of its adjusters on August 1, 1932. In this report, the adjuster says the claimant's immediate foreman, Major Hardin by name, stated that she came to him and complained of having a pain in her side, but did not state that she had been injured.

A carbon copy of the medical order given to claimant by the telephone operator is in the record. It would seem that the original of this copy given to the claimant for presentation to Dr. Coffin or the hospital did not indicate her ailment. The operator, however, wrote in pencil on the copy kept in the office the words "pain in side." The operator testified that the custom was that, when these orders were issued on account of accidents, the word "accident" was written

after "medical order;" if not an accident case, but ordinary sickness, a line would be drawn under the words "medical order." This practice was not followed in this case, and but for the pencil notation made on the carbon copy, and not on the original, the medical order would be one for accident.

The issue here being wholly one of fact, we have quoted at some length from the testimony. A careful reading of the record and evidence convinces us that the finding of the trial court in reversing the order of the joint board is sustained by a preponderance of the evidence, and that the presumption in favor of the joint board's order has been overcome. While there may be some discrepancies in some of the details of the testimony supporting claimant's position, in the main the testimony is positive and convincing. The testimony of the witnesses for the department is wholly negative. There can be no doubt as to the condition disclosed by the operation performed by Dr. Sells. His testimony indicates that, while it would be somewhat unusual, the condition could have had its origin as testified to by the claimant. Indeed, while the department, through its cross-examination of Dr. Sells, sought to demonstrate the improbability of the existence of a blood clot of such long standing, its own witness De Priest testified to the existence of the lump on the right abdomen of the claimant shortly before the date of the injury. His attempt to fix the date is not convincing.

Claimant made her application for compensation to the department within the twelve months' period fixed by the act. She offered a reasonable explanation of her failure to make an earlier claim— her reliance upon the statement of Dr. Coffin that her trouble was not compensable.

While we think the court correctly reversed

the finding of the joint board upon the issue of fact before it, we are of the opinion that the court was not warranted in determining the time loss sustained by the claimant, or in otherwise attempting to classify or fix her compensation. The sole action of the joint board was the rejection of the claim as based upon an injury not proven to have arisen in the course of employment. The joint board did not pass upon any question of classification or time loss. Under the rule announced in *Cole v. Department of Labor and Industries,* 137 Wash. 538, 243 Pac. 7, this question must be passed upon in the first instance by the department.

The judgment of the trial court reversed the finding of the joint board rejecting the claim for compensation, and allowed compensation for time loss for the period of thirteen months. The case is referred back to the superior court, with direction to so modify its judgment as that it will direct the department to receive and acknowledge the claim for compensation in accordance with the views expressed in this opinion.

The allowance of attorneys' fees made by the trial court may stand.

BEALS, TOLMAN, HOLCOMB, and BLAKE, JJ., concur.